1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3        Before The Honorable Kandis A. Westmore, Magistrate Judge

4

5  UNITED STATES OF AMERICA,        )
                                    )
6            Plaintiff,             )
                                    )
7  vs.                             )   No. 3:19-MJ-71534-MAG-1
                                    )   Related Case No.
8  JAMES HEYWARD SILCOX, III,       )   CR 19-00491-JST
                                    )
9            Defendant.             )
   _____)
10
                                    Oakland, California
11                                  Thursday, September 26, 2019

12
   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13            RECORDING 11:03 - 11:54 = 51 MINUTES

14

   APPEARANCES:
15

   For Plaintiff:
16
                             United States Attorney's
17                              Office
                             1301 Clay Street, Suite 3405
18                           Oakland, California 94612
                        BY:  SARAH E. GRISWOLD, ESQ.
19
   For Defendant:
20
                             Federal Public Defender
                             1301 Clay Street, Suite 1350N
21                           Oakland, California 94612
                        BY:  JEROME MATTHEWS, ESQ.
22
   Transcribed by:            Echo Reporting, Inc.
                             Contracted Court Reporter/
23                           Transcriber
                             echoreporting@yahoo.com
24

25

2

1  <u>Thursday, September 26, 2019</u>                      <u>11:03 a.m.</u>

2                      P-R-O-C-E-E-D-I-N-G-S

3                              --oOo--

4           THE CLERK:  Calling matter 19-MJ-71534-MAG, U.S.A.

5  versus James Heyward Silcox.

6      Counsel, please state your appearances.

7           MS. GRISWOLD:  Good morning, your Honor.  Sarah

8  Griswold for the United States.

9           THE COURT:  Good morning, Ms. Griswold.

10          MR. MATTHEWS:  Good morning, your Honor.  Jerome

11 Matthews for Mr. Silcox.  Mr. Silcox is present.  He is not

12 in custody.

13          THE COURT:  Good morning, Mr. Matthews.  Good

14 morning, Mr. Silcox.

15          THE DEFENDANT:  Good morning, your Honor.

16          THE COURT:  Okay.  So this matter is on -- it

17 looks like he needed to submit a financial affidavit.  Mr.

18 Rusk (phonetic) was provisionally appointed.

19          MR. MATTHEWS:  That's correct, your Honor.

20          THE COURT:  Okay.

21          MR. MATTHEWS:  I had him fill out a financial

22 affidavit with an attachment.  It's a little complicated,

23 and I'll tell you at the outset that there's some

24 information in the pretrial report that's not entirely

25 accurate because he was giving information without the

3

1  benefit of his wife who basically keeps all the family

2  finances.

3            THE COURT:  Oh.

4            MS. GRISWOLD:  And, your Honor, while the

5  Government is not privy to any of that information that the

6  Court has, I will want to put on the record the Defendant's

7  publically available income information because it is

8  drastically different.  I don't know whether it comports

9  with what the Court has.

10           THE COURT:  Okay.  Go ahead.

11           MS. GRISWOLD:  Thank you.  So Mr. Silcox is a

12 commander in the U.S. Coast Guard.  His level is O5.  He has

13 more than 18 years of service.  Those pieces of information

14 are used to determine his income.  It's my understanding his

15 wife has those same two pieces of information.  She is also

16 a commander at the O5 level with more than 18 years of

17 service.  Their base pay for each one of them is $8,998.50

18 every month.  That is taxable income.  They have additional

19 income from the Coast Guard that is not taxed.  The

20 Defendant has a housing allowance every month of $3,780 that

21 is not taxed.

22           THE COURT:  Three thousand seven hundred and

23 eighty dollars.

24           MS. GRISWOLD:  Yes.

25           THE COURT:  Okay.

4

1   MS. GRISWOLD:  His wife has an untaxed housing allowance
2   every month of $5,457.
3           THE COURT:  Oh, okay.
4           MS. GRISWOLD:  They each also have an untaxed cost
5   of living allowance that is approximately $100 every month.
6           THE COURT:  Okay.
7           MS. GRISWOLD:  So, overall, the Defendant and his
8   wife are clearing approximately $27,500 a month in income,
9   and not knowing what's in the financial affidavit, the
10  Government just has concerns that that's a lot of money for
11  someone not to be able to afford an attorney or to
12  contribute toward an attorney.
13          THE COURT:  All right.  Thank you very much.  I
14  appreciate that additional information, and this form that's
15  been submitted to me does have an attachment regarding
16  assets, but it doesn't seem to contain the non-taxable
17  income that the Government just referred to.
18          MR. MATTHEWS:  Right.  And, yeah, my -- okay.  I
19  need to take -- take my time with this.  Number one, the
20  reason you've got incorrect information at least in
21  Pretrial's report is the -- Mr. Silcox was a little stressed
22  out.  When we talked about income, he was telling me at the
23  outset he thought I was asking for his per paycheck income
24  when I was asking for his monthly income.  I have corrected
25  that because I met with both of them this morning because it

5

1 didn't -- we still hadn't figured it out completely, and he

2 said his wife was going to be able to come in and give me a

3 much more complete picture.  So you will see on the

4 affidavit itself that I've included the wife's income as

5 well as his income.

6     I came up with $20,000 total between the two, not

7 $27,000.  So I don't know what I'm not accounting for, but

8 that's the information that I got, and maybe that didn't

9 include their housing allowance, and I could put that under

10 the --

11        THE COURT:  It may not.  Yeah, it may not include

12 the housing allowance, because that would be over $9,000

13 between the two of them.

14        MR. MATTHEWS:  It looks like that, correct.

15        THE COURT:  An additional $9,000 a month.

16        MR. MATTHEWS:  Okay.

17        THE COURT:  And then the $100 times two as well --

18        MR. MATTHEWS:  Two hundred, okay.

19        THE COURT:  -- for the cost of living is not

20 included in here either, so that the Government's figure

21 looks to be a little bit closer to accurate.

22        MR. MATTHEWS:  Okay.  And --

23        THE COURT:  And there are substantial other assets

24 it looks like.

25        MR. MATTHEWS:  Right.  So when -- not knowing how

6

1  the Coast Guard operates, I think part of the problem could

2  also have been the precision of my questions because I'm not

3  thinking in terms of housing allowances typically with a

4  client.  I'm not thinking in terms of property with a

5  client.

6          So when I'm saying what is, you know, your paychecks,

7  what do they net out to, what do you actually bring home

8  after taxes every month in your paycheck, that's the

9  question I'm asking.  I'm not thinking about housing

10 allowances.  So I'm just saying that to suggest to the Court

11 that any imprecision between the two proffers from the

12 Government and myself was probably on me and not on my

13 client misleading anybody.  Okay.  And that's also the

14 reason that I attached the worksheet for the properties in

15 Florida, again, because during pretrial he didn't have

16 access to all the information, and I just wanted the Court

17 to understand what position these particular properties was

18 in, how much equity he may or may not have, and then the

19 loans that have been taken out in connection with improving

20 one of the properties.  So it's a little bit complicated.

21         Where I ended up, anyway, based on the information I

22 had, was their expenses and their income while not exactly

23 one -- you know, money in, money out with a net zero, didn't

24 leave them with a lot of income left over every month.  Now,

25 I think that's -- that's as exact as I can state it, but I

7

1  didn't see any significant surplusage which would

2  automatically disqualify him from public representation.  I

3  concede that this could be one of those cases where at the

4  end of the case, the Court reviews the financial situation

5  and determines whether or not contribution is warranted, but

6  I would like to accept appointment in this matter.

7           THE COURT:  Well --

8           MS. GRISWOLD:  And, your Honor --

9           THE COURT:  -- I don't -- I don't know that I

10 agree.  I don't think -- I don't know that he's qualified

11 for appointment of counsel at all.  Looking at the rent and

12 mortgage payment -- that's a lot of money for food.

13          THE DEFENDANT:  Four kids, your Honor.

14          THE COURT:  There's different information about a

15 checking account and savings account in the Pretrial

16 information than there is on this form.

17          MR. MATTHEWS:  Correct.  Okay.  With respect to

18 the IRA, my understanding is there was a certain amount of

19 money in his IRA.  I think we talked about something like

20 $7,000, but that's been almost completely wiped out in

21 connection with trying to -- okay.  So the money from the

22 IRA's were used to help make the down payment on the

23 property in Coco Beach, Florida.  So the balance in the IRA

24 is what is in the affidavit, not what is in the Pretrial

25 report.

8

1          THE COURT:  And then what about in this USAA
2    Federal Checking account?
3          MR. MATTHEWS:  Okay.  So that -- right, that shows
4    a --
5          THE COURT:  That's depleted as well?
6          MR. MATTHEWS:  -- large balance in the Pretrial
7    report and a much smaller balance -- I've got the wife here
8    Can I consult with her for one second?  Because, again, this
9    is -- I'm sorry.
10      The difference between what's in Pretrial and what's in
11   the affidavit with respect to the USAA account represents
12   money that was taken out of the account that is going
13   towards construction of the house in Coco Beach.
14         THE COURT:  Okay.  I guess my concern here is that
15   usually we're talking about indigent people when we're
16   giving them counsel, when the Government is providing them
17   with counsel, not people who have valuable real estate and,
18   you know, substantial monthly incomes.
19         MR. MATTHEWS:  Your Honor, obviously I don't
20   dispute that.  However, I mean, I -- we've had situations
21   where people have owned residences that are underwater which
22   appears to be the case with Mr. Silcox's family.  And,
23   although it is real estate, you know, as a practical matter
24   in terms of their monthly expenses and monthly income, it's
25   not something that disqualifies them.  So that's what I'm

9

1  asking the Court to take into account.

2          THE COURT:  On the real property listed as a

3  homestead, that's the home --

4          MR. MATTHEWS:  I'm sorry.  Homestead, Florida,

5  that's the city.

6          THE COURT:  Oh, that's the town?

7          MR. MATTHEWS:  Yeah, that's the -- right.

8          THE COURT:  Okay.  So which one does he live in,

9  because there's one --

10         MR. MATTHEWS:  He lives in Alameda, your Honor.

11 They rent in Alameda.

12         THE COURT:  Oh, they rent out the other two?

13         MR. MATTHEWS:  Correct, right.  So, yeah, I -- the

14 reason I submitted a separate sheet is I wanted the mortgage

15 separated out, mortgage being it's an owned property,

16 separated out from the rental, what they pay under the lease

17 for the property that they rent in Alameda.  There's just no

18 way I could make sense of that in a form and have you

19 understand.  So --

20         THE COURT:  Right.

21         MR. MATTHEWS:  -- correct.  The property in

22 Alameda for which they pay I think $3400 a month in rent is

23 -- here that's where they live, and they rent.  They do not

24 own it.

25         THE COURT:  So they receive rental income on the

10

1    other two properties?

2           MR. MATTHEWS:  Correct -- well, no.  They receive

3    rental income on the Homestead property in Florida in the

4    amount of $2,000 a month.  Their mortgage payment is $2400.

5    Therefore, they are actually having to pay -- the rent is

6    not covering the mortgage.

7           THE COURT:  Oh, okay.

8           MR. MATTHEWS:  So that's a $400 expense.

9           THE COURT:  Okay.  And then on the one in Coco

10   Beach, they are not collecting rent?

11          MR. MATTHEWS:  Correct.  That is some place that

12   they would like to live when they retire, and -- is that

13   correct?

14          THE DEFENDANT:  Yes, sir.

15          MR. MATTHEWS:  And so that's -- that's a property

16   that they just purchased and they've taken out, in addition

17   to the mortgage, a construction loan of $75,000 that they've

18   got to make payments on as well.  So there's really no, you

19   know, discernible equity that they could leverage out of

20   that property.

21          THE COURT:  Right.  I see what you're saying.  So,

22   in addition to the monthly expenses listed on the financial

23   affidavit, which are, I don't know, maybe almost $8,000 --

24          MR. MATTHEWS:  I think it's a little more than

25   that, your Honor.  I think I -- I tried to total it quickly,

1 but --

2             THE COURT:  I didn't count student loans.

3             MR. MATTHEWS:  Okay.  Right.

4             THE COURT:  Because that's just life.  Join the

5 club.  And there's credit cards.  Maybe a little bit more

6 than $8,000, and then another five for the properties.

7             MR. MATTHEWS:  Right.  So I came up with around 13

8 or 14.  So --

9             THE COURT:  And we're talking -- so 13 -- even if

10 it's 14, out of -- well, $27,500 is gross I guess.  Is

11 that --

12            MS. GRISWOLD:  Approximately $10,000 of that is

13 not taxable.  So there's about $18,000 that would be gross.

14            THE COURT:  Well, I mean, it -- he still has

15 potentially $10,000 left.  So, you know, maybe at the very

16 least he should pay something towards the cost of his

17 representation, and at worst he should just hire an

18 attorney.  I don't know how much an attorney would cost for

19 his defense.  Do you have some sort of idea if he had to --

20            MR. MATTHEWS:  I have been out of private practice

21 for so long I have no clue.  I know what I would charge, but

22 that's neither here nor there.

23            THE COURT:  Right.

24            MR. MATTHEWS:  I have looked at -- I've discussed

25 the case extremely briefly with my colleague across the

12

1  aisle here.  It's not exceptionally complicated, but, you

2  know, I -- I can't say, your Honor.  I just -- I don't know

3  what the going rate for criminal defense lawyers are at this

4  point.

5          THE COURT:  I would think for a retainer he would

6  probably have to pay at least $5,000.

7          MR. MATTHEWS:  Oh, it would be more than that.

8          THE COURT:  Okay.

9          MR. MATTHEWS:  I mean, you pay $5,000 for a DUI.

10         THE COURT:  Okay.

11         MR. MATTHEWS:  Okay.  So, yeah, I can honestly

12  represent that --

13         THE COURT:  It would be more than that for the

14  retainer?

15         MR. MATTHEWS:  -- it would be substantially more

16  than that for a retainer.

17         MS. GRISWOLD:  Your Honor, may I suggest we

18  postpone -- we keep this in abeyance and give the Defendant

19  perhaps a week to actually go out and see if he can afford a

20  lawyer, how much it would cost?  That is something that most

21  people making the kind of money he makes would take upon

22  themselves to figure out.

23         MR. MATTHEWS:  Your Honor, my client just informed

24  me that he's already actually talked to some lawyers.  I

25  wasn't aware of that.

13

1          THE COURT:  Oh, you have?

2          MR. MATTHEWS:  Right.  And the figures he was

3   getting was like $35,000.  So --

4          THE COURT:  That you would have to pay up front?

5          THE DEFENDANT:  Minimum.

6          THE COURT:  Okay.

7          THE DEFENDANT:  Not up front, your Honor, but just

8   kind of --

9          MR. MATTHEWS:  To handle the case?

10          THE DEFENDANT:  -- a ballpark.

11          THE COURT:  Okay.

12          THE DEFENDANT:  They were talking about -- mostly

13   -- usually they were saying about 50 percent of that up

14   front.  They said that was kind of the -- 30 was kind of the

15   minimum, and then they all said it could go higher.

16          MR. MATTHEWS:  Your Honor, yeah, I'm not asking

17   that he not contribute.  I'm only suggesting that the Court

18   examine his finances at the conclusion of the case and if

19   contribution is appropriate, I'm sure my client -- well, my

20   client would be obligated to and would be happy to do that.

21          THE COURT:  Okay.

22          MR. MATTHEWS:  I just think that under the

23   circumstances, it's close enough where that would be an

24   appropriate -- under the Criminal Justice Act Statute to

25   appoint me with a requirement of contribution at some point.

14

1          THE COURT:  I do -- I mean, I -- I believe that if
2  I'm going to appoint you as counsel, I'm going to order him
3  to make a contribution.  It just is a matter of how much.
4  And given the income that he still has left over after he
5  pays all his monthly expenses, it seems to me he -- he
6  should be able to pay at least a couple of thousand dollars
7  a month towards his expenses for this litigation.  I don't
8  see why the Government should pay for that.  I mean, I know
9  it's not going to be fun.  It's going to be hard.  But even
10 if he only paid $2,000 a month, subject to looking at it at
11 the end of the case and determining whether or not maybe he
12 should have even paid more, that would be something that I
13 think I could live with.  But just saying that it's fine for
14 him to have in excess of $10,000 after expenses and not have
15 to make a contribution is not okay.

16          So that's -- I'm inclined to order -- I don't even
17 know how much.  You know, you said it's not going to be that
18 complicated of a case.  I don't know how much the billing is
19 even going to be for you.  Do you have some idea?

20          MR. MATTHEWS:  You know, quite frankly, this is
21 the first time this has happened.  So I don't know how that
22 would work.  I mean, I have to keep track of my hours and,
23 you know, assign them to a case in our software.  I'd have
24 to talk with Mr. Kalar to figure out exactly how we would
25 make a representation to the Court about --

15

1        THE COURT:  If you want, I can give you an

2  opportunity to get that information --

3        MR. MATTHEWS:  Yeah, I -- I would appreciate that.

4        THE COURT:   -- so that I can determine what a

5  reasonable amount of the contribution towards the costs

6  representation will be.

7        MR. MATTHEWS:  Your Honor, could I have one minute

8  to speak with Madam Prosecutor?

9        MS. GRISWOLD:  I'm going to have a response to

10  this also.

11        MR. MATTHEWS:  Oh, okay.

12     (Pause.)

13        MS. GRISWOLD:  Just very briefly with respect to

14  the -- to Mr. Matthews' logging his hours and how much that

15  is worth financially.  The Government has a concern that

16  whatever hours Mr. -- that defense counsel is spending on

17  this are hours that he will not be spending on other more

18  indigent clients.  And so our concern isn't that it should

19  be the same dollar figure that the FPD would somehow

20  allocate for his services but that it really should be based

21  on this particular Defendant's ability to pay because of the

22  resources that are then not available for other more

23  indigent defendants.

24        THE COURT:  Yeah.  Good point.  I mean, I just

25  don't usually get people that have this kind of income

16

1   and --

2          MR. MATTHEWS:  Completely understood.

3          THE COURT:  -- assets asking for the Government to

4   pay for their attorney.  So it's not normally a calculus

5   that I have to figure out, and I'm not content with just

6   waiting until the end of the case.

7          MR. MATTHEWS:  Right.  That's fine.  Well, I can

8   certainly talk to, like I said, Mr. Kalar today.

9          THE COURT:  But I -- but I -- but the Government's

10  point is well taken, that just figuring out how much your

11  billing is might not be the right way to do it either.

12         MR. MATTHEWS:  Well, I mean, there's -- I think

13  Mr. Kalar is the best judge of that because, you know, cases

14  demand different types of work.  It's not just -- and it's a

15  question of hours.  Sometimes hours are a function of how

16  often I have to go to Santa Rita to visit somebody if

17  they're in custody.  So it's -- I think he is in the best

18  position certainly to give the Court input on that.  I mean,

19  I think the Government's position is well taken.  But,

20  again, he knows better than anybody our allocation from

21  Congress on a yearly basis and how we spend it, and I think

22  he's in the best position to give the Court an honest

23  assessment of what should happen here.

24         THE COURT:  Is the Government receptive to getting

25  feedback from Mr. Kalar first and then maybe having a

17

1 further hearing on this?

2          MS. GRISWOLD:  We would request the Court to issue

3 an order that could then be revisited.

4          THE COURT:  Okay.

5          MS. GRISWOLD:  With approximately $10,000 of

6 disposable income every month, $2,000 seems imminently

7 reasonable for this Defendant to be able to cover, and we

8 would just ask that that get started.

9          THE COURT:  Okay.  So that's what I will do,

10 because that's what I was inclined to do anyway, and then,

11 Mr. Matthews, you can come back and ask to modify that --

12          MR. MATTHEWS:  Okay.

13          THE COURT:  -- if you need to.

14          MR. MATTHEWS:  So, just so I understand, I

15 understand the order.  Is this payable to the clerk?  Who is

16 it payable to?

17          THE COURT:  I think it's payable to the clerk of

18 the court.

19          MR. MATTHEWS:  Okay.

20          THE COURT:  This is sort of a first for all of us,

21 but --

22          MS. GRISWOLD:  And may I just request a payment

23 schedule, whether it be the 1st of the month or -- just

24 something specific on the record.

25          THE COURT:  Is there a particular day of the month

18

1  that works best?

2        MR. MATTHEWS:  Can I consult with my client on

3  this?

4        THE COURT:  Sure.

5     (Pause.)

6        MR. MATTHEWS:  Your Honor, I spoke with Mr.

7  Silcox's wife who, of course, you know, is also in the Coast

8  Guard.  She is not completely in agreement with the figures

9  that the Government is giving you.  I can't assess that one

10 way or the other.  It definitely is higher than the figure

11 she was giving me today.  So she says that they could

12 definitely -- they could swing $1,000.  She said they cannot

13 swing $2,000 a month.

14        THE COURT:  And so is there some way to get

15 confirmation of what the figures actually are?

16        MS. GRISWOLD:  Your Honor, I have two CG's

17 officers, special agents, in the room, and if the Court

18 would like to hear from one of them, I'd be more than happy

19 to let -- to let --

20        THE COURT:  I would love to hear from them.

21        MR. MATTHEWS:  Okay.  Well -- I understand that,

22 your Honor.  But I think we -- if we're going to have a full

23 blown hearing on that, then I would need to have Ms. Silcox

24 address you as well, because she has evidently much more

25 command of the family's financial situation than my client

19

1   does.

2           THE COURT:  Okay.

3           MR. MATTHEWS:  Okay.

4           THE COURT:  That's fine.  So who would you like to

5   have come up?

6           MS. GRISWOLD:  Special Agent Amari Aguiar

7   (phonetic).

8           THE COURT:  Okay.

9           MR. AGUIAR:  Good morning, your Honor.

10          THE COURT:  Good morning.  Can you -- if we could

11  place him under oath, that would be great.

12      But, as an initial matter, state your full name for the

13  record and spell your last name.

14          MR. AGUIAR:  Certainly, your Honor.  First name is

15  Amari.  Last name is Aguiar.  It's A-G-U-I-A-R.  And I'm a

16  special agent with the U.S. Coast Guard.

17          THE COURT:  Okay.  Thank you.  All right.  So I

18  need to ask you some questions about the financial situation

19  for the Defendant, specifically there seems to be some

20  dispute about the income that he and his wife receive as

21  commanders in the U.S. Coast Guard, including the taxable

22  and non-taxable income that they receive.  And so I want to

23  get some clarification because it seems as though the

24  Defendant's wife disagrees with the figures that the

25  Government has provided to the Court.

20

1          Indira, do you have it or no?  If you don't, I can
2  wing it.  That's fine.
3          THE CLERK:  I don't.
4          THE COURT:  Can you raise your right hand, please.
5  Do you swear that the information that you are about to
6  provide to the Court is the truth to the best of your
7  knowledge?
8          MR. AGUIAR:  Yes, your Honor.
9          THE COURT:  Okay.  All right.
10          MR. AGUIAR:  Your Honor, could I pull out my
11  phone, because basically I pulled the figures out of the
12  Internet.  I'm not an expert myself, but according to the
13  defense.gov, an O5 in the Coast Guard, their basic pay --
14          THE COURT:  So, first, before you read that, can
15  you tell me exactly what -- what source of -- on the
16  Internet you're getting this from?
17          MR. AGUIAR:  Absolutely, your Honor.  This is from
18  the militarypay.defense.gov, which is a government website.
19          THE COURT:  Okay.  Militarypay dot --
20          MR. AGUIAR:  -- defense --
21          THE COURT:  -- defense.gov?
22          MR. AGUIAR:  Yes, your Honor.  Basically, the
23  pod.defense.gov is the parent website, and then if you were
24  to select the pay chart for active duty military, it takes
25  you to the military pay.

1       According to that chart, with 18 years in service, an
2  O5, which is a pay grade of commander, basic pay, which is
3  the taxable amount, is $8,998.50.

4               THE COURT:  Okay.  And then there's additional
5  non-taxable income indicated there as well?

6               MR. AGUIAR:  It is not on this page.  I was not
7  prepared to speak, but I can pull that up based on the pay
8  grade if you were to allow me a couple of minutes just for
9  the Internet to function.

10              THE COURT:  Okay.

11              MS. GRISWOLD:  Is that also on the Defense
12  website?

13              MR. AGUIAR:  On the same website, your Honor.

14              THE COURT:  Okay.  Why don't I allow you to look
15  for that.  If you could just be seated there and look for
16  that, and we can have Ms. Wilcox -- I mean Silcox.

17              MR. AGUIAR:  Absolutely.  Thank you, your Honor.

18              THE COURT:  Sure.

19              MR. MATTHEWS:  And, your Honor, before she begins,
20  just so you're clear, I want to make sure I didn't
21  misrepresent anything.  It might be that her dispute is on
22  the expense side, not the income side.  Is -- it's on the
23  income side?

24              MS. SILCOX:  Uh-huh.

25              MR. MATTHEWS:  Oh, okay.  I think she's going to

22

1  swear you in.

2       THE COURT:  Okay.  So please state your full name

3  for the record.

4       MS. SILCOX:  Good morning, your Honor.  My name is

5  Emma Elizabeth Silcox.

6       THE COURT:  Okay.  And you are the Defendant's

7  wife?

8       MS. SILCOX:  That is correct, your Honor.

9       THE COURT:  Okay.  So you've also been sitting in

10 the courtroom.  We're having some discussion here about your

11 husband and your financial condition because he is asking

12 the Court to appoint counsel to represent him.  That is

13 normally something that is reserved for indigent defendants,

14 not for people who have substantial income and resources.

15 So I'm trying to get to the bottom of exactly what your

16 income is --

17       MS. SILCOX:  Yes, sir -- yes, your Honor.

18       THE COURT:  -- so that I can determine what your

19 financial resources are because at this point I do not --

20 I'm on the verge of saying he's not even qualified for

21 appointment of counsel.  So I'm sort of entertaining this

22 discussion so that at the very least I can determine what

23 kind of a monthly contribution he should make.

24       So you disagree with the figures that the Government

25 has provided, and so before you make any statements to the

23

1 Court about the basis for your contentions about your income

2 and your husband's income, I'd like to swear you in.  So if

3 you could please raise your right hand.

4      Do you swear that the information that you're about to

5 provide to the Court is true to the best of your knowledge?

6              MS. SILCOX:  I do, your Honor.

7              THE COURT:  All right.  Go ahead.

8              MS. SILCOX:  So after taxes, the total gross

9 income that we bring home with both paychecks is $46,600.

10              THE COURT:  Forty-six thousand six hundred.

11 That's take home?

12              MS. SILCOX:  Take home.  And that's what I

13 provided in the spreadsheet to his attorney, his current

14 attorney.

15              THE COURT:  Okay.  So that's after taxes?

16              MS. SILCOX:  That is correct.

17              THE COURT:  Salary.  And is there some separate

18 non-taxable amount that you receive or is that included?

19              MS. SILCOX:  That includes everything.  And, just

20 for the record, the BH amount that the Government provided

21 was incorrect.  It's actually $4600.

22              MS. GRISWOLD:  For which of you?

23              MS. SILCOX:  For myself.

24              MS. GRISWOLD:  I'm sorry.  I didn't understand.

25              MS. SILCOX:  For myself.

24

1          THE COURT:   Forty-six hundred a month?

2          MS. SILCOX:   Yes.  But the total after taxes that

3    we bring in per month is 46 -- I'm sorry, $24,600.

4          THE COURT:   Twenty-four thousand six hundred.

5          MS. SILCOX:   And I know -- I know we do make a lot

6    of money, and I know it's frustrating, and if I could write

7    the Court a check for $2,000 a month, I would.  I would

8    gladly write the check, but --

9          THE COURT:   So tell me why you can't.

10          MS. SILCOX:   The fact of the matter is we can't.

11   Unfortunately, in May we bought this house.  We were

12   planning on retiring this next summer, and so now we have

13   the additional mortgage.  We have the additional $2600

14   mortgage, the additional $2300 construction bill, the

15   additional utilities for that house that we are not renting

16   out because we are supposed to move into it this next

17   summer, and that will -- basically liquidated any additional

18   savings that we were putting away.  So we are pretty much

19   living paycheck to paycheck for the most part.  Asking me to

20   provide any -- I can probably make do with $1,000, but

21   asking me to do anything else would require me to cancel any

22   activities the kids would be doing, cut into my ability to

23   provide for my children.  So that's what you would be asking

24   me to do.

25          THE COURT:   Okay.  So why don't you explain a

25

little bit more, because the information that I have about
that property does not include, you know, things like
utilities.  The only place I have things like utilities is
under your -- your -- I guess where you're residing now with
your rent.  It includes utilities of $934.  You've got
your --

MS. SILCOX:  So between the three properties, I
have about $2100 in utilities.

THE COURT:  So $2100 in utilities versus the $934
that I'm looking at here?

MS. SILCOX:  Yes, your Honor.

THE COURT:  And then you said you would also be
prevented from providing for your children.

MS. SILCOX:  Yes.  They're --

THE COURT:  Your children aren't listed here, and
your expenses include clothing and food and --

MS. SILCOX:  And their college funds.

THE COURT:  Well, you know, some people don't have
college funds, Ms. Silcox.  Indigent people who get --

MS. SILCOX:  So you're asking me --

THE COURT:  -- free representation don't have --

MS. SILCOX:  I understand.

THE COURT:  -- college funds.  I'm not asking you
to take money out of the college funds necessarily.  I'm
just saying to the extent that you're wanting to --

26

1          MS. SILCOX:  But you are.

2          THE COURT:  -- contribute to them --

3          MS. SILCOX:  If we're -- no.  I'm saying if you're

4   asking me to pay two grand, you're asking me to stop my

5   children's college funds.  This is the discussion that we're

6   having right now.

7          THE COURT:  You mean your ability to continue to

8   contribute to them?

9          MS. SILCOX:  Yes.

10         THE COURT:  Oh, yes.  Okay.  Then that is the

11  discussion we're having.

12         MS. SILCOX:  Correct.

13         THE COURT:  Right.  And I understand that it's

14  very disturbing to you, but at the same time you're standing

15  here in this courtroom asking the Government to pay for your

16  husband's legal fees, and that's something that's reserved

17  for indigent defendants, people who don't have -- they don't

18  own property.  They don't have any money.  They barely make

19  enough money to survive at all, if -- if any money.  That's

20  -- those are the people that the Court appoints attorneys

21  for.  So there are some people who are on the borderline.

22  And so when I see people on the borderline, then I start

23  looking at, well, maybe they can make a couple hundred

24  dollars contribution.  We're talking small amounts of money.

25  With you it's a completely different story.  It's a luxury

27

1 to be able to save money for a college fund for your

2 children.  That is not an indigent person's problem.

3          MS. SILCOX:  My children and I did not commit this

4 crime.  We --

5          THE COURT:  I recognize that.

6          MS. SILCOX:  -- should not have to pay for it.

7          THE COURT:  I recognize that.

8          MR. MATTHEWS:  Could I have a moment, your Honor?

9          THE COURT:  Yes.

10     (Pause.)

11          THE COURT:  And, certainly, you know, no one is

12 suggesting that you should never contribute to your

13 children's fund, but right now your husband needs

14 representation.  He needs legal representation, and it has

15 to be paid for.

16          MS. SILCOX:  I understand.

17          THE COURT:  He will be able to contribute to your

18 children's funds later, after you've finished paying for his

19 legal fees.

20          MS. SILCOX:  Your Honor, I'm willing to pay.

21          THE COURT:  So the way it looks to me, you can

22 afford to pay the $2,000 a month.  I mean, unless I get a

23 much more detailed spreadsheet that makes it very clear to

24 me that it's going to prevent them from living, you know,

25 sort of, you know, on a real basic sort of level.  I -- I

1  think it's unconscionable for me to have to balance things

2  that are luxuries versus resources that are provided to

3  indigent defendants.  And, as it is, we don't normally, you

4  know, spend time figuring out how people can keep their

5  future retirement real estate.

6      So we can do that if they're so willing.  Otherwise, I

7  can just find them not qualified for appointment of counsel,

8  and then they can go find an attorney.

9          MR. MATTHEWS:  This is my suggestion, your Honor.

10  I'd like a brief continuance.  I don't mean today.  I mean

11  I'd like a couple of days to work through this.  There's no

12  reason that the case can't proceed if I'm provisionally

13  appointed, and it could be that we come back and you find

14  the spreadsheet persuasive and we can conclude this or you

15  find it not persuasive and something else will result.  But

16  I would like the -- I would like the opportunity to work

17  with both of them, get more detail.  I mean, this is just

18  going to be more involved than I first thought.  And I don't

19  want the Court to do any inference that either of them have

20  held anything back because this is a complicated financial

21  situation, certainly much more complicated than I handle

22  because of the nature of my job.  Maybe you don't have all

23  the information.  But I'd just like the opportunity to dot

24  the I's, cross the T's, and then get you a -- a spreadsheet

25  or whatever it is that is conclusive, and there is no

1 question about precisely what their expenses are, and that

2 way the Court can make an informed decision.

3          THE COURT:  We also have a longer form financial

4 affidavit.  I don't know if that one might be --

5          MR. MATTHEWS:  Yeah, I took a look at it, and it's

6 -- you know, because it's -- it's just not involved enough.

7 So I think I just have to lay things out, and they'll try

8 and get as into the minutia to the extent that I can

9 accurately.  That just -- and I'm just saying that that's

10 going to take a little while because --

11          THE COURT:  And how many days do you need?

12 Because I'm sort of wanting to make some sort of decision on

13 this pretty quickly.

14          MR. MATTHEWS:  Well, since it's before you I

15 guess, I would going to say Monday.

16          THE COURT:  Okay.

17          MR. MATTHEWS:  Because otherwise it's going to go

18 onto Judge Ryu's --

19          THE COURT:  Right.

20          MR. MATTHEWS:  -- calendar.

21          THE COURT:  If you can do it -- if you can come

22 back Monday, that would be best.

23          MR. MATTHEWS:  Okay.

24          THE COURT:  And then I can just make a final

25 decision.

30

1          MR. MATTHEWS:  Right.  I'm going to be here

2  anyway.  So --

3          THE COURT:  Okay.  On Monday.  And so that would

4  just be on the regular 10:30 calendar.  And, you know, as

5  much detail as you can provide me would be appreciated.  And

6  in terms of the testimony from the agent, I really think it

7  would be more reliable to have not general information from

8  a website but actual information from the Coast Guard --

9          MS. GRISWOLD:  Yes, your Honor, we'll have that

10  Monday.

11          THE COURT:  -- about what they are receiving.

12          MS. GRISWOLD:  Yes, your Honor.

13          THE COURT:  Seems like that would be more specific

14  and more reliable.

15          MR. MATTHEWS:  I guess the other loose end, your

16  Honor, is Monday's hearing, if -- if I'm appointed, then we

17  can deal with -- obviously with, you know, Pretrial's

18  suggestions on conditions and stuff.  That's still kind of

19  out there.

20          THE COURT:  Right.

21          MR. MATTHEWS:  And if we need to set this for

22  counsel, then that would be something taken care of by -- I

23  just want to kind of tie that loose end up.

24          THE COURT:  So I will continue to have -- well,

25  right now it's --

31

1          MR. MATTHEWS:  He's on supervision, but I think

2    Pretrial suggested something.  So if I'm not going to be --

3          THE COURT:  Right.

4          MR. MATTHEWS:  -- counsel, I just want new counsel

5    to be able to address that.  That's all.

6          THE COURT:  Well, for now, I believe that the only

7    condition that's been requested by Pretrial Services is that

8    the conditions stay the same but that we add the condition

9    that he not change his residence without prior approval of

10   Pretrial Services and the new bond form that was prepared --

11   it's sort of a new form, slightly new format -- that

12   language states that the Defendant must not change residence

13   or telephone number without prior approval of Pretrial

14   Services, and it seemed to me that's not some objectionable

15   addition.  So we could all agree on that.

16         MR. MATTHEWS:  Yeah.  I don't think that's an

17   issue, your Honor.  But I didn't even know that you had the

18   bond form from San Francisco.

19         THE COURT:  I have a photocopy of it.

20         MR. MATTHEWS:  Oh, you do?  Okay.

21         THE COURT:  Have you seen it?

22         MR. MATTHEWS:  I have not.

23         THE COURT:  Oh, okay.

24         THE CLERK:  I have a copy.

25         THE COURT:  And so that -- the change would just

32

1  be a matter of checking off that additional box.

2          MR. MATTHEWS:  No, that's fine.

3          THE COURT:  So we could dispose of that issue now.

4  Otherwise, all of the conditions that you were previously

5  released on, although -- no, I'm sorry.  There's a slight

6  other difference.  He was released on --

7          MR. MATTHEWS:  Yeah, OR.

8          THE COURT:  -- OR.  This recommendation has a --

9          MR. MATTHEWS:  Fifty thousand dollars.

10          THE COURT:  -- recommendation of a $50,000

11  unsecured bond, which means essentially you don't have to

12  worry about having to pay $50,000 if you just comply.  So if

13  you comply with all of the conditions of your release,

14  there's no consequence, and the bond would be exonerated at

15  the end of your case.  If, however, you fail to appear to

16  deal with these charges or you otherwise violated the

17  conditions that have been set for your release, then the

18  Government could go -- come back to the Court, file a motion

19  for a judgment of $50,000 against you for the full amount of

20  that, including interest and costs.  So it just gives you a

21  stronger incentive to make sure you're 100 percent in full

22  compliance, and you've already surrendered your passport.

23      So I'm prepared to go ahead and make the recommended

24  changes unless the parties want to make arguments on those

25  changes.

1          MS. GRISWOLD:  No.  The Government concurs with

2    the commendations.

3          THE COURT:  Okay.  And when we finally settle on

4    what the status of his representation is, Mr. Matthews, if

5    you -- if it's you or somebody else who ends up representing

6    him and you want to raise any issue with respect to the

7    conditions of his release, you can always do that.

8          MR. MATTHEWS:  Okay.

9          MS. GRISWOLD:  And, your Honor, depending on what

10   the Monday hearing determines regarding the Defendant's

11   financial status, the Government may seek to convert that

12   from an unsecured to a secured bond.

13         THE COURT:  Okay.  Right now it will be unsecured.

14   And I am writing that on this photocopy that I have since I

15   don't have the original.  So what I've done is I've just

16   added in the $50,000 unsecured amount, and I'm checking off

17   the box that he not change his residence or telephone number

18   without prior approval of Pretrial Services.  And then I'm

19   signing this amended version.

20       And then I would like it if we could get Mr. Silcox's

21   signature on this amended bond, especially since it's just

22   under his name.  We're not having him have a co-signer or

23   anything.  Okay.  And then we'll just make sure that we make

24   a copy of this since this is not in that form that we can

25   pull out duplicates and make sure we provide that to Mr.

34

1  Silcox and to Pretrial Services and to the Government so

2  that everybody has a copy of the latest version.  But we'll

3  have to do that after court.

4          THE CLERK:  And should I mail a copy to Mr.

5  Silcox?

6          THE COURT:  You can mail it to him or if he wants

7  to hang out and wait for it, you can make a copy and give it

8  to him.  That's the only change that you need to keep track

9  of, but you should probably have the latest version, and

10  then you've gone through the -- when you appeared before the

11  other judge, you went through the conditions with him.

12  Okay.

13      All right.  And so I think that's taken care of.  Other

14  than that, I will just plan to see you here on Monday at

15  10:30.

16          MS. GRISWOLD:  Yes, your Honor.  There is one,

17  maybe two more issues.  This was also set as the preliminary

18  hearing date.  Now there's plenty of time on the clock for

19  the preliminary hearing up until I believe October 8th.

20          THE COURT:  Okay.

21          MS. GRISWOLD:  I was in grand jury this morning.

22  I understand returns will be at 3:00 o'clock this afternoon.

23          THE COURT:  So there will be an indictment?

24          MS. GRISWOLD:  That's my understanding.

25          THE COURT:  Okay.

35

1          MS. GRISWOLD:  I would ask the Court to continue

2   the prelim.  We could do all of this on Monday.  He could

3   appear and --

4          THE COURT:  He can be arraigned on the indictment.

5          MS. GRISWOLD:  -- be arraigned, if that --

6          THE COURT:  Right.

7          MS. GRISWOLD:  -- if the Court is --

8          THE COURT:  That's fine.

9          MS. GRISWOLD:  -- comfortable with that.  Okay.

10          THE COURT:  So we'll put it on for further hearing

11   on the appointment of counsel and arraignment on the

12   indictment so that we take care of all that.

13          MS. GRISWOLD:  Thank you.

14          THE COURT:  Okay.  So, Mr. Silcox, I'll see you on

15   Monday at 10:30.  Okay.  All right.

16      (Proceedings adjourned at 11:54 a.m.)

17

18

19

20

21

22

23

24

25

36

## CERTIFICATE OF TRANSCRIBER

1
2
3      I certify that the foregoing is a true and correct
4  transcript, to the best of my ability, of the above pages of
5  the official electronic sound recording provided to me by
6  the U.S. District Court, Northern District of California, of
7  the proceedings taken on the date and time previously stated
8  in the above matter.
9      I further certify that I am neither counsel for,
10 related to, nor employed by any of the parties to the action
11 in which this hearing was taken; and, further, that I am not
12 financially nor otherwise interested in the outcome of the
13 action.
14
15
16      Echo Reporting, Inc., Transcriber
17           Thursday, March 19, 2020
18
19
20
21
22
23
24
25